Thank you, Madam Chief Judge, and may it please the Court, Kenneth von Gerand, for the Appellant's River Ventures and Excel Specialty. This case shows us, speaking kind of as the law professor for 46 years, this shows us the development of contracts, marine contracts, over the last 70 years. When you look back 72 years ago, the courts and the contracts allocated responsibility in tort cases in a similar fashion. It was based upon fault. But, starting 72 years ago, commentators, and then led by this Court, including the great Admiralty Judge, Judge Brown, started touting the importance of fault allocation being substituted for allocation on reciprocal indemnity. And so, you see that in the contracts over the years. You see how they've evolved. In this case, by 2015, the master service contract is actually very well written. It's a very good contract. Just because your time's precious, am I right that the crux of this issue is that the District Court, this is a third time up on appeal, the District Court agreed with Centaur's expert, Domelisi, that there was mutual repugnancy. And by virtue of UBT requiring that the workman's comp be secured, therefore, the exclusion had to be inserted. The two can't work together, according to Domelisi. Am I right? That's what the District Court ultimately says rendered this . . . Well, she said two things. First, she had to find that the provisions were ambiguous. Well, she did that in the summary judgment. But ultimately, after trial, what she said is it would be absurd to have two separate insurance provisions that defeat each other. And that was accepting expert Domelisi's testimony. Right. My question to you is, did you cite to the District Court or to us case law that rebutts that legal conclusion? Well, let me rebut it two different ways. Well, I'm asking you to rebut it just one way. Did you cite to the District Court or to us law, Louisiana law, that says, in fact, they're not mutually repugnant? Well, this is an admiralty contract. Okay. Well, under federal admiralty law, then. What's the case you cited to the District Court to disagree with Domelisi's statement adopted by Judge Malazzo that you couldn't have secured both? Well, you see, the actual point is we cited the fact that you can. I know you did, but I'm asking you, what is the law that you submitted contrary to paragraph 16 in her breach analysis? All right. And all of the contract, the standard contract provisions like Kimball case that we cited, is a case that says the number one point is you cannot take and make a provision in a contract superfluous or useless. And so what you have in this particular case is you have a provision in a contract that says you are required to get SP-23 and everybody knows. Again, I'm asking you what one case, not all of the cases. I gave you Kimball. So, for example, what we are focused on here, correct me if I'm wrong, is Louisiana's workman's comp here with the MEL endorsement. It's Longshore. It's not Louisiana has nothing to do with this. Okay. Longshore. UBT wanted workman's comp, statutory workman's comp, yes or no? Yes. Okay. And is it true that that form has a mandatory escape clause? You don't get it if you're getting the employee covered on the P&I. Right. So that's what Judge Malazzo accepted. Is that premise correct? No, it's completely confused. It's an utter misunderstanding of the insurance provisions. Okay. It's a complete and utter misunderstanding. The testimony misunderstood it too because what she said, she found it compelling. Judge Higginson. She found it compelling that the UBT group was not named on the MEL. She found that compelling because there are requirements for MEL. There are requirements for MGL. There are requirements. I may still be confused. I thought she accepted Domelisi's expert testimony that if you got crew coverage on the P&I, that would kick out the maritime workman's comp. The worker's comp. Yes. But this is not a worker's comp. I know, but UBT did require workman's comp. Yes. Okay, right. But if by operation of law, the escape clause is that kicks out P&I. It only kicks out P&I to the extent that the P&I covers EL. It's not an EL case. You have to have the P&I. You have to have it here or the whole contract falls. I'm sorry. Go ahead and answer. You have to have it because the liability of Centaur is EL. The liability of UBT, the liability of its contractors, River Ventures, is general liability. Right. That's not covered under an MEL policy. It's absolutely not covered. You have to have either MGL or P&I, depending upon whether a vessel's involved, and that's why she threw out the baby with the bathwater. You can't do that in this case. Her analysis is flawed under the contract for several reasons. One, it's contrary to the indemnity. Can I ask a question? Absolutely. Is the first error that it's not ambiguous on the point, the contract is explicit, the first error of the district court that it's not ambiguous, that it says not less than the P&I SP-23? That's correct. The plain text says you have to have this, so it wasn't ambiguous on the point. I'm sorry. It wasn't ambiguous on the point to begin with. And second, even assuming arguendo that it is ambiguous on the point because of the existence of the workers' comp other part, you can't interpret them together to X out the coverage under our case law. So the P&I, as to the crew and the workers, has to stand, regardless, even if it is ambiguous. Is that correct, or do you see it a different way? That is all correct. I don't think you ever have to get to the post-ambiguity, but if you did, if you did, I would cite you to this court's opinion in Tullier, which is a wonderful decision because it explains, when you have insurance provisions and you have indemnity provisions, it explains that those can conflict. And there is a long line of cases in this court going back for decades where those conflict. And they don't really conflict here, and I'll explain that in my time. But the point is that that line of cases in Tullier, it's in the reply brief, Judge. Well, I'm looking at the reply brief, and I'm sure you understand what you wrote. I'm focused on footnote 36. And in footnote 36, you cite Sarah Vance's opinion. You'll probably remember it in, what is it? Do you remember your footnote 36? I'd have to look. Okay. Insurance Company of North America against West of England. Oh, correct. Okay. And that stood, I thought, when I looked at it, and it cited our case in a case called Cyphers, correct? Yep. That the two are not repugnant. That duplicative insurance frequently happens. It happens all the time. Is that what was happening here, or am I oversimplifying what you were saying before? It's such a good question, and let me go through that with you. State insurance, a little different than maritime. This is the marine insurance. State insurance, you have the overarching general liability policy. That policy excludes auto. Auto policy fills it in. It excludes employer's liability. Employer's liability fills it in. It excludes professional liability. Same thing. Your time's ticking. They fit together fairly well, not perfect. It's different in marine. It's different because you have EL and you have MEL, as we did here. That's critically important in this case because it's a Longshore case, and there's potential Jones Act, because this case was brought both as a Jones Act case and . . . But we've already decided he's not a Jones Act seaman. Yes. She decided that, and so the appeal was dismissed. The point is that they need coverage, MEL, for Jones and for Longshore, because there's a third party under Longshore EL. Now, when you're being sued as the vessel owner, like River Ventures, or as the charterer or whatever, as UBT, would have been sued, but they weren't sued, then in that case, you've got to have liability insurance that matches, because this contract's a perfect match, that matches the indemnity. And so Centaur says, I'll take my employees. That means I'll get EL for me, and I'm going to get P&I that covers your liability, because getting MEL does nothing for UBT. It does nothing for Centaur, because that's EL. They're not being sued employer's liability. And as I cited in a footnote in the brief, they can't even be named on that policy. That's not allowed. Were all these arguments made before the district court, Mr. Angeron? Yes. But she's confused. You can see . . . Well, I'm still confused. MEL is confused. All I tried to ask you, and it may well be you understand the patchwork better. All I tried to ask you is, what is the significance of your site to Judge Vance's opinion in footnote 36? How does that pertain to our trying to resolve this case in controversy? What did . . . I'm sorry. I asked about the insurance company of North America versus West of England, which in turn itself cites ciphers. Sorry. How does that help us resolve this dispute? Just that body of law. No other body of law. There are . . . The point is that the policies . . . There is going to be . . . There is going to be in a well-written marine contract, there's going to be a little bit of overlap. There has to be a little bit of overlap if you want the employer's liability to fall under the workers' comp MEL. There has to be a little overlap. That's not a big overlap. You can simply write an exclusion in the P&I for an employee of the insured, and that takes care of the whole thing. It takes care of the whole thing. Judge Vance's opinion . . . My casebook's great opinion . . . talks about the fact that just because on the EL side, you've got both EL and P&I, that happens all the time, and the escape clauses in both are repugnant, and then you go and you divide it according to pro rata. The point is, there are ways to fix this. There are multiple ways to fix this. The thing not to do in this situation is to put in an exclusion for employees of any insured because then you throw out the GL as well as the EL, meaning there's this gaping hole. There's this gaping hole in the coverage. And so you don't . . . Just because there's a little bit of duplication doesn't mean that you throw out the entire liability scheme and that liability scheme is supposed to, according to the terms, match the indemnity. The indemnity is a pure reciprocal all the way through the chain for injuries, so a centaur has to indemnify all the way down to River Ventures. The insurance is the same. Only she and Centaur created a hole in the insurance program by doing too much, using, as I said, a sledgehammer instead of just a small exclusion. That small exclusion wouldn't breach the contract, wouldn't do anything, but she created a major gap right in the center of the liability coverage. Mr. Angeron, even if we were to hold that MSC did require Centaur to procure a P&I policy with crew employee coverage, as I believe you're arguing, why would River Ventures' vessel not being on the policy schedule cause a problem with whether there's a breach or not? And is this just a really interesting argument about coverage, but there's no actual breach here, or do you have an answer for that? There is, of course, an answer, Your Honor. When you look at the terms, UBT Group, who's required to be named, they're required to be named, includes River Ventures and its vessels, which include the trooper. The Traveler's Policy has an endorsement that adds, as insureds, adds, as insureds, everyone who is required to be named. So they are, the vessel trooper is therefore named as an insured under the policy. So unequivocally... Even if it's not on the schedule, it's named as an additional, like an additional insured sort of situation? It's named as an insured under the policy, and the policy says that there's coverage for owners of vessels named herein. It is named. Thank you, Mr. Angeron, and you've saved time for rebuttal. Thank you. Is it Mr. Schlatterer? Okay. Thank you. May it please the Court, Brad Schlatterer and Sean McLaughlin for Centaur. Your Honor, I want to talk for a moment about the gap in coverage. There is a gap in coverage, but it's nothing that's been discussed so far. Why are these, as Judge Malazzo said, tortured arguments being made, like in the coverage case where you presided, Judge Dennis, why are these tortured arguments being made about coverage? If we look back at the contract between Centaur and UBT and we look at 7664, it's under the CGL policy. That's where the intent of these parties is shown. And when you look at B8, when you look at that provision, you're going to see it is blank. Normally, the coverage for this situation comes under a CGL policy. Let me explain why. A CGL policy always has a watercraft exclusion. And so when you are in a maritime context, there's always a negotiation that goes on for this provision. Because if you want to take that vessel exclusion out of the CGL policy, it'll cost a lot of money. That is exactly what happened here. UBT and Centaur, before this contract even started, and this contract was for multiple projects, not just this project, but before this contract even started, talked about that very issue, about would the watercraft exclusion be removed. And there is a red line, and when you look at the red line, it is at... ROA 7688. You'll see that negotiation where the watercraft exclusion being removed was redlined out. That's why when you look at 8, it's blank. That's where the coverage ordinarily comes in this case. Because River Ventures, as soon as they found out we had a CGL policy, they were coming to Centaur and saying, wait, we might be an additional assured under that policy. We want to make a claim under it. Well, how did the claim arise? On a vessel. The watercraft exclusion was still in the CGL. So that gap in coverage was negotiated by these two parties. Again, I'm very aware that I have to study this case more, but my point of departure is to look at the district court's analysis, and that's paragraph 16 in her breach of contract. And that doesn't cite any law. She concludes that the contract was absurd because there were two mutually repugnant clauses. Could you start with, are you defending that conclusion of the district courts? Absolutely. And when we look at the provision under 7697 ROA, that is the actual maritime coverage endorsement. When you look at the bottom of that document, you see that it says copyright from the National Council of Compensation Insurance. They draft these for each state. So when you are looking at, in paragraph 5, when you're looking at A6, which tells you you have to get the maritime coverage endorsement, this is the form. And that was the aha moment that happened for Judge Malazzo at trial. When you look at that testimony that she was going back and forth with Mr. Domelius, she said, well, I'm looking at the maritime coverage endorsement. Why is there C-13 in there? C-13 says very clearly, this insurance does not cover bodily injury covered by a P&I policy. That's the exclusion, the escape. That's the exclusion. And the exclusion, as Mr. Domelius testified to, is carved in stone because it is regulated by the Louisiana Insurance Department. Think about that. You're going into what UBT told Centaur to do. But see, that was my understanding of this case. It isn't where I necessarily am, having heard opposing counsel talk. But clearly she interjected during the trial, I read the whole trial, to say, to procure the MEL insurance, you have to have the exclusion. That's why your client put in the exclusion. But then my focus was on his reply brief because it seems like there is case law, Fifth Circuit and Louisiana law, that would say, no, the two don't destroy each other, it just creates duplicative coverage. They're both primary. Well, that is not going to be the positions taken by those insurance companies, and I've been involved in those cases, and I can tell you, when you have those situations and you have an exclusion that says, this insurance does not cover anything in a P&I policy, they are going to issue a declination of coverage. Centaur is going to have to go hire coverage counsel. They're going to have to sue the company. That's back to her point that it will be costly. There will be disputes. But ultimately, are you familiar with our Cipher case? I'm familiar with that. Why wouldn't that control the outcome or defeat her conclusion that it's absurd to get both? Well, when you're looking at that case, in this one, in this workers' comp, with this maritime coverage endorsement, you actually have an exclusion. What they're referring to in that case, when you look at the P&I policy, it's the cover elsewhere provision. So there is a difference in how they're coming at those exclusions. And that will be a dispute. And I do not know how that is going to be resolved. What we do know is that there is going to be no coverage for that company. And there may be coverage in the future one day, potentially. But each one of those companies is going to be raising it. Let's look at what Ken Domley said, because they spoke about that very issue. And Ken Domley said, I've been doing this. He was a maritime broker at McGriff and at Marsh, two of the largest marine insurance brokerage companies in the world. He worked there for 40 years. He said when he sees the coverage that comes in the workers' comp and says to get the maritime coverage endorsement, he always removes it from the P&I policy. But he did say that was a modification he did for the needs of Centaur, didn't he? Well, unfortunately, Mr. Skinner was the broker. He's not here to defend himself. The gentleman passed away. But when you look at the red line document, you see those discussions that are had in that document that Mr. Skinner did. But Mr. Domley said in his experience, the custom is when you have an MEL policy and it tells you to get the maritime coverage endorsement, you go to the P&I policy and you remove the crew automatically. Do we use any of this testimony at all if we say it's not ambiguous? Does the federal maritime law? Texas law might allow you to use, depending on which jurisdiction you're in, and the appeals court might allow you to use an expert on a meaning of a contract even if it's not ambiguous. But does federal maritime law allow us to use the testimony of the experts on the contract and what was meant by the parties if it's not ambiguous? Your Honor, I don't have an answer for that. I am unsure of what maritime law is on that. So if we don't think it's ambiguous, we don't use any of this. Is that what you would say? I'm saying I don't know if that is or is not the case. Did you assume that we were already starting with the premise that it was ambiguous? No, I was not, Your Honor. When we're looking at this, are there two reasonable interpretations? That's what we're told under the Apache Deepwater decision. And under the Apache Deepwater decision, when you're looking at you must get the crew coverage and you must put it into the comp policy. And then when it says not less than an SP-23, I think it was very reasonable that Judge Malazzo wanted to get more information on that. Part of the more information was getting expert testimony from Mr. Domeles and what the custom of the industry is. But really, the big thing is the Louisiana maritime endorsement that we spoke about. That's not part of the contract. But that is critical to this analysis. And it's critical because of that exception. When we're talking about the intent of the parties also, Your Honor, we can look at what did UBT do in the contract with River Ventures? Because that also gives you what is the intent of the parties. And what I think is very interesting in the River Ventures contract, it's tab 7 of our excerpts, ROA 7669. When you look at schedule B, what did UBT tell River Ventures to get in their P&I policy? They said get a P&I policy with crew coverage. That's an important factor because we're not talking about a case or what someone else might have done. This is the contracting party. The contracting party in its discussions with River Ventures and it was talking about getting a P&I policy, it told them go ahead and include your crew in the P&I policy. When it was speaking to Centaur, it said include your crew into the Louisiana workers comp policy. So UBT is dictating where they want the crew. The response to that is, well, those words are superfluous. But there are cases where it talks about crew coverage. I mean, we're talking about the Land Reverse Oceanic case. Land Reverse Oceanic is a case about a P&I policy where crew was required. It's not an odd thing to require when you're saying P&I policy. And when you're saying not less than, there are dozens of coverages in a P&I policy. It is not just the crew. So when they're saying not less than, they're referring to a bunch of other coverages there. But when you're talking about the crew, UBT told Centaur get the crew in the workers comp policy, which as Mr. Donnelly said, as soon as you get it here, you've got to take it away here. If you don't, it's going to be mutually repugnant. I don't know if you're going to get coverage. I know you're going to be embroiled in coverage litigation for years and years. And what gets worse? Maybe Mr. Donnelly's wrong about what the result of mutually repugnant is. Mr. Donnelly? Yeah, the idea that it's, that's the second question of, is it ambiguous? And then the way I had formulated it, then if it were indeed ambiguous but mutually repugnant, that the idea that you take away the coverage is not the way that the law works, is it? And so he was saying you'd have issues, and it would cause complications. But if it were mutually repugnant, the answer is not you just drop it out, is it? Under the law. Well, I mean, the man's been doing it for 40 years, and he says that that's how it's done in the industry. Under the law, there is going to be a coverage fight. Yeah, a coverage fight. And that's what we're trying to resolve right now, assuming argumentatively, it is indeed mutually repugnant. And so, but if it's mutually repugnant, it still doesn't drop out, does it? Well. That's what case says it drops out if it's mutually repugnant. Maybe I'm missing something basic, but that seems to be a really important point. It seems that one policy has an exception, and the P&I policy has an other cover. And I can tell you that those, I don't know of a case that meshes those two interests and comes out with a decision. Each party is going to be saying that they have no coverage. How that is going to shake out six years later, I'm unsure. But if mutually, if when faced with two escape clauses threatening coverage, courts must find the mutual repugnant and make both policies liable for the claim. And there are ciphers. Right. Why are we dropping them out? Well, we're dropping them out because we're not trying to create that coverage situation. I mean, you have to understand that when UBT told Centaur to do this, there was no accident at the time, and River Ventures was nowhere to be found. This is just UBT and Centaur. I mean, it doesn't, when you look at the contract and you look at the CGL policy, it doesn't make a lot of sense that you're going to say, let's take out number eight. Let's keep the watercraft exclusion in because that policy will be cheaper and will be more efficient and will let you give us a better price on the contract. But at the same time, I'm going to turn around and make you buy two policies that will have provisions that point at one another with exceptions. It doesn't make sense. And then when you throw on top of that what River Ventures had in its own policy, where UBT told River Ventures, get it in employer liability endorsement unless you get it in the P&I policy. And then when you look at the P&I policy, they're told to include crew in the P&I policy. Centaur is not told to include crew. So we have the party who is orchestrating this entire marine insurance scheme, and when they want you to get crew coverage in the P&I policy, when you look at River Ventures' contract, it says that. When you look at Centaur's contract, it does not. In fact, it says the exact opposite. Centaur in A6 is not given the escape clause when you look at the River Ventures contract. I just don't understand that there's a double coverage absurdity here, though. I don't see any double coverage absurdity that requires us to find... And then I also don't understand why, if there is such a thing, why the result is no coverage. That's the problem. Those are two problems. And so perhaps you could help me, because obviously this is complicated and... Yes. The double coverage... The double coverage is... Why would UBT want to save money on aid, taking it out of the CGL, because they want to get the vessel exclusion removed? Why would they allow them to do that? And at the same time, you have to buy both of these policies. You have to go to the workers... It may not have been smart, but it doesn't mean that it's unlawful. Or absurd. Just because it costs money doesn't mean it's absurd. Just because it's not the best business decision doesn't mean absurd, does it, under the case law? Well, I think when you're looking at the intent of the parties, when you look at the River Ventures contract and you look at the Centaur contract, to interpret it that way, I believe, is absurd. I guess, I mean, the point of struggle, it seems to me, is everyone agrees UBT Group said, and UBT Group includes River Ventures, they say, get us the SB23. Yes. And then your expert says, well, we modified it on behalf of your client's needs. Yes. We modified it. We took out the crew exclusion so as to be able to comply with UBT's request that comes under Workman's Comp. Correct. Okay. But if you can't cite any law that says that putting it under the P&I, the crew coverage under the P&I, destroys the request at Workman's Comp, then there is no absurdity. I think that's what I'm at least struggling with. So do you have a case, or is your point, this is undecided, it'll be costly, why would you do this? It's undecided, it would be costly, I don't know why you would do that. Okay, and that is exactly what Domelisi said. Yeah, and I mean, it's exactly what he said. I guess I'm asking the same question, Judge Elrod's question. Why is it our concern whether it's costly and undecided when UBT Group made an explicit contractual request that was promised saying, we'll get SB 23 with the coverage? Yes, because when you look at that same party and what they did in the same situation with River Ventures, True. They told them to get coverage. Why would we ever look at that? That's the point. Why would we look at extrinsic evidence if there isn't ambiguity? If your own experts said, we modified it because it was going to be costly, it was difficult, it's unanswered. Well, he said it was going to be costly and that is not how these contracts are handled in the industry. When you have crew in one, you do not get crew in the other because you're concerned about the coverage dispute. In addition to cost, you're concerned about that coverage dispute and how that might shake out. I think one of the things is under the P&I policy, one of the questions, Chief Judge Elrod, that you asked was, why does it matter? Is this an academic discussion? It is. Under the P&I policy, the only party that was sued is River Ventures. There was no in-rim claim against the vessel. So when you have a P&I policy and you are the party who is sued, you put on that hat and you step into the P&I policy. And the first thing that P&I underwriter is going to say, where is your vessel scheduled? There is a schedule of vessels. Isn't that the best, easiest argument then if you were right on that? Why are you doing all this other gymnastics? Well, because we believe that Ken Domeles was right, that when you buy it here, you don't buy it there. But at the end of the day, it doesn't matter. And what they want to say is... But I'm trying to say what the additional insured are. That's right. But the thing is that who was sued. That's how you trigger the policy, right? It's indemnity policy. Who was sued? River Ventures was sued. The underwriter is going to go to River Ventures and say, where's the name of your vessel? Where is it on the schedule? Because that's how you develop risk when you come to a P&I policy. It is you find out the vessel, the tonnage, the risk profile, damages, and then you give a price for each vessel. That's how a P&I policy works. The whole idea that, well, the vessel isn't insured. The vessel wasn't sued. So that is the easiest way to it, Chief Judge Elrod. I mean, it is the fact of River Ventures was sued. Where is your vessel scheduled? And you can't say that UBT told us to schedule the MV Trooper. Is it right for us to rule on that? Yes, absolutely. I mean, because there is no response because the response is, well, the vessel is an additional insured. Okay, and if the vessel had been sued, it could have put the hat on and stepped into the P&I policy and asked for coverage. But it didn't. It wasn't sued, and it's not on the schedule anyway. You want to talk about upending maritime insurance? Start saying that P&I policies can provide coverage for a non-scheduled vessel. There's two ways they could have done that. Number one, UBT could have went through and found all the vessels and told Centaur, schedule all these vessels. Or second, just tell them to delete the as-owner language in the P&I policy because then it doesn't matter if it's a scheduled vessel or not. When you look at the contract, if we want to look at the contract and say it's unambiguous, it's unambiguous that the as-owner language was not told to Centaur to strike through it. So then there can be no coverage. There's two ways to get that coverage. Number one, the P&I policy needs to have a scheduled vessel, or number two, the as-owner language. The only party sued in this case was River Ventures, and River Ventures does not have a scheduled vessel under the P&I policy. Thank you. Thank you, Your Honor. Thank you, Your Honor. Mr. Slaughter. Mr. Armstrong, you've saved time for rebuttal. Thank you, Your Honor. I'll start with the last part about the schedule. That'd be nice if the coverage said for scheduled vessels it says for a vessel named herein, and the endorsement names River Ventures and its vessels. So it fits directly within the coverage grant. So what about the vessel not being sued in this particular lawsuit? Does that matter? Because the vessel's not on the hook, so we don't have to look to whether the additional insured would come into play if the vessel were saying, we need coverage by golly, because we've been sued in this lawsuit. Right. And so the point is that River Ventures is covered for vessels that are named, not scheduled. And so since it is a named vessel, River Ventures is covered for its liability as the owner of the trooper. It fits directly within the language of the travelers. But the vessel is not in the lawsuit. So why does it matter that the vessel is covered? Because it's a P&I policy. P&I policy, as he absolutely pointed out, is liability as owner of a vessel. That's the hallmark to a P&I policy. So River Ventures has to be sued in the capacity as owner of a vessel named in the policy? It is. Is it long past the time that the vessel could be added and fix that if that's a glitch? Is it long past that time with all these various years of appeals? Yes. This is language. The good thing about this is that the contract contains that exact language, the UBT definition that we've talked about, that is taken and clipped and put into the policy. So the policy matches exactly the coverage that was necessary. Well, I'm trying to find out if the policy matches the lawsuit, the complaint, which is a different question. Yes. And with the exception of the crew exclusion, the policy matches exactly because the policy contains, their policy has the SP-23 attached. It's got 1, 2, 3, 4, all the way 1 through 14, including number 1, which is injury to any person. But then it's got the exclusion that was put in for employees of any insured, not the insured. And this court has looked at, and there could have been an easy fix for this that would not have thrown the whole thing out. And if you want an example, Alamond versus Buggy Corporation is a great Fifth Circuit case that has the correct language in it that could have been used. And that language says that we're going to exclude an employee of the or crew of the insured, not any insured. That was the problem that they did in this case. They just went too far. They made a mistake. They did it because they misunderstood. And the whole argument that we heard up here is all EL. It's all EL. It's all employer's liability. That's a red herring, a complete red herring here. Because whether or not there was duplicative coverage under EL or not, that's utterly irrelevant. Because what we have here is a GL claim, a general liability claim, a maritime liability claim. That's what's covered under MGL or P&I. And then the last argument. Well, before your time's up, again, just reducing your argument, Judge Malazzo erred reversibly because what? Because she created a gap in coverage that does not exist to protect against a point where there was a minor overlap that could have been fixed. But I thought by requesting an SP-23 generally, there was no flexibility whatsoever for Centaur to fix small or big at all. Oh, they absolutely can. Under the contract, by requesting SP-23, they had some latitude to not get the standard form, just not what they did. They have the latitude to do it because what they are required to do is get the equivalent of SP-23, which number one is the crew. And if it's an EL claim, they get the equivalent by putting it under the MGL. That's not a breach of contract if I say I'm going to give you something and I give it to you. What is a breach is to then say, OK, because I put the EL over here, I'm going to take the GL away from over here. That's an answer to your question. If I could follow up on one. Would they be right? I mean, this is purely hypothetical. But would they be right had he been a Jones Act seaman? Would there have been no gap here? No. Because you see, the Jones Act seaman, that's the EL claim against Centaur. Yes. So whether he's Jones or, well, whether he, well, strike that. If he's a Jones Act seaman, we aren't here today. I know. Because the indemnity kicks in. It's perfectly valid indemnity. And the indemnity takes it out. We're here today because that he is a longshoreman. I'm sorry. It's crucial. The only reason you are here is that he is designated as a longshoreman. That's correct. And that is why through the 70 years, the last 70 years, these contracts have evolved. They've evolved amazingly. And when you look at your great case, it goes back to Voisin versus Otico 40 years ago this year. OK. Thank you, Mr. Angeron. We have your argument. We have both arguments. And we appreciate them in the case. Thank you. Thank you, Your Honor. Chief Judge. Thank you.